

**ORDERED in the Southern District of Florida on February 8, 2016.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

In re:                                    CASE NO.: 15-21596-EPK

**INTERNATIONAL OIL**                     CHAPTER 7
**TRADING COMPANY, LLC,**

      **Alleged Debtor.**
_____/

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

      **THIS MATTER** came before the Court upon *Mr. Al-Saleh's Motion for Summary Judgment as to Involuntary Petition* [ECF No. 54] (the "Motion for Summary Judgment") filed by petitioning creditor Mohammad Al-Saleh, the *Alleged Debtor's Memorandum in Opposition to Mr. Al-Saleh's Motion for Summary Judgment as to Involuntary Petition* [ECF No. 116] (the "Response") filed by International Oil Trading Company, LLC ("IOTC USA"), and *Mr. Al-Saleh's Reply to IOTC's Response* [ECF No. 118] (the "Reply").   The Court has considered the Motion for Summary Judgment, the Response, the Reply, and the record in the above-captioned bankruptcy proceeding, and grants the Motion for Summary Judgment [ECF No. 54] in full for the reasons stated herein.

I.    Background

The following facts are not in dispute.

**The Parties**

Mr. Al-Saleh is a citizen of The Hashemite Kingdom of Jordan.  He resides in Amman, Jordan.

IOTC USA is a Florida limited liability company founded by Harry Sargeant, III and Mustafa Abu-Naba'a in 2005.  Mr. Sargeant is an American citizen who resides in Florida.  Mr. Abu-Naba'a is a resident of the Dominican Republic.  The sole member of IOTC USA is International Oil Trading Company, Ltd. ("IOTC Bahamas"), formerly known as International Oil Trading Company FZCO ("IOTC Dubai").  As a result of their ownership in IOTC Bahamas and other entities, Mr. Sargeant and Mr. Abu-Naba'a have controlled IOTC USA at all relevant times.[1]  Pl. Exh. 55 at 14 (deposition transcript of Kevin Kirkeide, IOTC USA Chief Financial Officer). [2]

Mr. Al-Saleh has never had an ownership interest in IOTC USA.  Pl. Exh. 51 (admission of IOTC USA).  For reasons described below, Mr. Al-Saleh has stated that he considers himself a "partner" in certain activities conducted by IOTC USA.  Def. Exh. 11 at

---

[1] Mr. Sargeant, together with various associates and family members, owns and operates a number of entities involved in fuel transportation, refining, and procurement.  *See, e.g.*, case nos. 14-26919-EPK (involuntary bankruptcy proceeding filed against Mr. Sargeant by entities controlled by Mr. Sargeant's siblings and father and partially owned by Mr. Sargeant), 14-29027-EPK (chapter 11 bankruptcy of entities that were petitioning creditors in case number 14-26919-EPK).  Several of these entities were involved in the activities at issue in this case in some way.

[2] Plaintiff (Mr. Al-Saleh) exhibits are identified according to *Mohammad Mr. Al-Saleh's Index of Exhibits Provided in Support of Summary Judgment (in Chronological Order)*, attached to the *Notice of Filing* [ECF No. 124].

124-130 (Mr. Al-Saleh deposition).[3, 4]

### The Military Contracts

Mr. Sargeant and Mr. Abu-Naba'a have known each other since the 1970s and have conducted business together for several decades. In 2003, they became interested in transporting fuel through Jordan to Iraq on behalf of the United States government. The work entailed taking delivery of shipments at the port of Aqaba, Jordan, transferring the fuel to trucks, and transporting the product many hundreds of miles through dangerous territory to Baghdad, Iraq. The work would be conducted via contracts (the "Military Contracts") with a branch of the United States Department of Defense that became known as the Defense Logistics Agency (the "DLA").

Mr. Sargeant and Mr. Abu-Naba'a created a Jordanian company to undertake the project and obtain the contracts. They called the company International Oil Trade Center ("IOTC Jordan"), and each took a 50% stake.

In order to successfully bid for the Military Contracts, IOTC Jordan needed to provide assurance of permission from the Jordanian government to transport the fuel across its territory. IOTC Jordan recruited Mr. Al-Saleh to obtain the required permissions. In exchange for Mr. Al-Saleh's services, Mr. Sargeant and Mr. Abu-Naba'a gave Mr. Al-Saleh a one-third ownership stake in IOTC Jordan. Through this transaction, Mr. Sargeant and Mr. Abu-Naba'a caused Mr. Al-Saleh to believe that Mr. Al-Saleh

---

[3] Defendant (IOTC USA) exhibits are identified according to the list on pp. 1-2 of the *Appendix to Alleged Debtor's Memorandum in Opposition to Mr. Al-Saleh's Motion for Summary Judgment as to Involuntary Petition* [ECF No. 117].

[4] IOTC USA argues that Mr. Al-Saleh's statements are tantamount to an assertion that Mr. Al-Saleh is a one-third partner in IOTC USA's business. *See, e.g.*, Pl. Exh. 53 (response to interrogatory). There is no genuine dispute that Mr. Al-Saleh has never held a formal ownership stake in IOTC USA.

3

obtained a one-third stake in the entire enterprise contemplated by Mr. Sargeant and Mr. Abu-Naba'a.  See Pl. Exhs. 8-28 (transcript of jury trial resulting in finding of fraud by IOTC USA, Mr. Sargeant, and Mr. Abu-Naba'a, and judgment in favor of Mr. Al Saleh in amount of $28.8 million).

Mr. Al-Saleh's understanding proved incorrect.  IOTC Jordan was in fact only one of many entities controlled in whole or in part by Mr. Sargeant that participated in the Military Contracts. Beginning at least in 2005 with the founding of IOTC USA, Mr. Sargeant and Mr. Abu-Naba'a ensured that the Military Contracts were not awarded to IOTC Jordan.  Instead, IOTC USA took the contracts and, with Mr. Sargeant and Mr. Abu-Naba'a, diverted a substantial portion of the profits away from Mr. Al-Saleh.  *See id*.  Mr. Sargeant and Mr. Abu-Naba'a nevertheless involved Mr. Al-Saleh in the performance of the Military Contracts by arranging for IOTC Bahamas (then IOTC Dubai) to enter into an agreement with IOTC Jordan whereby IOTC Jordan would actually perform the fuel transport services in exchange for payment of expenses.  Def. Exh. 10 (the "Service Agreement").

From 2003 to roughly 2010, the IOTC entities entered into contracts with the DLA. The Military Contracts required the entities to transport fuel on a requirements basis through Jordan to Iraq.  To finance the massive undertaking, IOTC USA arranged a credit facility with ABN Amro Bank ("ABN").  To secure the financing, ABN obtained an assignment of all rights to proceeds under certain contracts.  ABN duly perfected that security interest.  Mr. Al-Saleh is not a signatory on the ABN credit facility.  Pl. Exh. 51.

**Florida Action Complaint and Pre-Trial Motion**

In 2008, Mr. Al-Saleh sued IOTC USA, Mr. Sargeant, and Mr. Abu-Naba'a (collectively, the "Defendants") in Palm Beach County, Florida.  Case No. 50-2008-CA-010187-XXXX-MB-AJ (the "Florida Action");[5] Def. Exh. 1.  In the complaint, Mr. Al-Saleh alleged that the Defendants had intentionally defrauded him by creating IOTC USA and funneling the Military Contracts into that entity, cutting Mr. Al-Saleh out of the business. Def. Exh. 1.

The parties conducted discovery and disputed jurisdictional issues for over two years.  Pl. Exh. 2 at 2 (the "Motion to Amend").  Finally, in November 2010, Mr. Al-Saleh filed a notice of trial readiness, and the Florida court set the matter for trial to be held in July, 2011.  *Id.*

The Defendants rushed to complete discovery to prepare for trial.  *Id.* at 2-3. Finally, in May 2011, the Defendants filed the Motion to Amend, asking the Florida court to vacate the order setting trial, permit the Defendants to amend their affirmative defenses and interpose a counterclaim, and allow intervention by a third party, IOTC Bahamas.  *Id.*

In the Motion to Amend, the Defendants sought to add 23 affirmative defenses.  *Id.* at 11, sub-Exh. A.  In addition, the Defendants sought to add a counterclaim to their initial response to the complaint.  Pl. Exh. 2 at 11, sub-Exh. B.  The counterclaim would also serve as a complaint, with intervening party IOTC Bahamas as plaintiff.  *Id.*  The proposed affirmative defenses were substantially similar to the proposed counterclaim and complaint.  The Defendants and IOTC Bahamas asserted three claims that they now attempt to re-assert as recoupment claims against Mr. Al-Saleh in the above-captioned

---

[5] Citations to the record in the Florida Action are hereinafter to the document numbers provided by the parties in their exhibits to the Motion for Summary Judgment.

involuntary bankruptcy proceeding.

First, the Defendants alleged that Mr. Al-Saleh engaged in "theft and/or diversion and/or misappropriation of funds earmarked for the payment of services provided by the National Resource Development Company (the "NRDC") to IOTC Jordan."  Pl. Exh 2, sub-Exh. A at 3, paras. 13, 14.  The Defendants asserted that Mr. Al-Saleh unlawfully retained $3 million that he was supposed to deliver to NRDC for payment of fees owed to a third party.  Pl. Exh. 2 at 5.  The Defendants and IOTC Bahamas also raised this NRDC-related claim in various counts of their proposed counterclaim and complaint.  Pl. Exh. 2, sub-Exh. B.

Second, the Defendants alleged that Mr. Al-Saleh "engaged in business ventures with non-party, IOTC Jordan's competition."  Pl. Exh 2, sub-Exh. A at 3, paras. 13, 14.  The Defendants later identified two competing parties, Supreme Fuels Trading FZE ("Supreme Fuels") and Al-Jasem.  Pl. Exh. 2 at 4-5.  The Defendants specifically alleged that Mr. Al-Saleh colluded with Supreme Fuels and Al Jasem in direct competition with the IOTC entities for several of the Military Contracts (the "Competition Claim").  *Id.*  In addition, the Defendants alleged that Mr. Al-Saleh improperly assisted Supreme Fuels in the filing of a bad faith lawsuit.[6]  *Id.*  The Defendants and IOTC Bahamas also raised the Competition Claim in various counts of their proposed counterclaim and complaint.  Pl. Exh. 2, sub-Exh. B.

Third, the Defendants alleged that Mr. Al-Saleh "hindered IOTC Jordan's performance of its own obligations under agreements it was a party to."  Pl. Exh 2, sub-Exh.

---

[6] In fact, Supreme Fuels won a $5 million judgment against IOTC USA, Mr. Sargeant, and other parties in that case.  The judgment is now final and unappealable.  IOTC USA does not dispute that it still owes Supreme Fuels over $5 million on the judgment. *See infra.*

A at 3, paras. 13, 14.  The Defendants identified those agreements as subcontracts with Supertrucker, a Jordanian trucking operation that performed transportation work under the Military Contracts.  Pl. Exh. 2 at 5.  The Defendants asserted that Mr. Al-Saleh deliberately inflated the subcontract price for Supertrucker in exchange for a secret commission or kickback (the "Supertrucker Claim").  *Id.*  The Defendants and IOTC Bahamas also raised the Supertrucker Claim in various counts of their proposed counterclaim and complaint.  Pl. Exh. 2, sub-Exh. B.

The Florida court heard the Motion to Amend on June 9, 2011.  Pl. Exh. 5.  With regard to the newly proposed affirmative defenses, the court denied the motion "without prejudice".  The Florida court specifically stated "that by agreement from plaintiff's counsel the defenses can be introduced at trial as to all the proposed new affirmative defenses, and if procedurally the defendant believes it is necessary and seek to leave to amend during trial the affirmative defenses to conform with the evidence, as any party can do, that the court will entertain that motion."  *Id.* at 136 (hearing transcript, p. 25).  Thus, while not permitting formal amendment to the answer prior to trial, the Florida court specifically permitted presentation of all of the proposed new affirmative defenses at trial with the possibility of a motion to conform the pleadings to the evidence at the close of trial.

With regard to the proposed amended counterclaim and the complaint by potential intervening party IOTC Bahamas, the Florida court denied the Motion to Amend "without prejudice for defense to raise it . . . in a separate claim at such time that they deem appropriate so as not to prejudice the defendants to raise that, but just not in this action given we're on the eve of trial."  *Id.* at 137 (hearing transcript, p. 26).[7]

---

[7] From this ruling one might conclude that the Florida court contemplated the possible presentation of all of the claims proposed as counterclaims and the IOTC Bahamas claims in a separate,

Prior to the Florida court's ruling on the proposed counterclaim and complaint, the parties to the Florida Action entered into a pre-trial stipulation.  Pl. Exh. 7.  That stipulation stated, in relevant part, that the trier of fact at trial would determine:

> 61. Whether Mr. Al-Saleh retained any or all of a $3 million transfer delivered to his care and trust in late 2006 for the purpose of forwarding that entire sum to NRDC . . .
>
> 63. Whether Mr. Al-Saleh did not include Sargeant or Abu Naba'a in any business enterprise in which Mr. Al-Saleh participated in competition with any or all of the following entities: IOTC Jordan, IOTC USA, IOTC Dubai . . .
>
> 64. Whether Mr. Al-Saleh benefitted from [the] kickback scheme with "Supertrucker" . . .

*Id.*  In other words, the parties to the Florida Action formally agreed that the substance of the NRDC, Competition, and Supertrucker Claims (collectively, the "Pre-Judgment Claims") would be actually litigated.  *See id.*

**Trial in the Florida Action**

The Florida court conducted trial in the Florida Action in July 2011.

At trial, consistent with the pre-trial stipulation and the pre-trial ruling of the Florida court, the Defendants presented evidence in support of their affirmative defenses.  *See, e.g.*, Pl. Exh. 21 at 55-56, 180-82 (trial transcript, pp. 1878-79, 2003-05) (witness testimony relating to Supertrucker and Competition Claims, respectively).  The Defendants

---

subsequent action.  As discussed more fully below, the only logical interpretation of this ruling is that it was intended to preserve the claims of IOTC Bahamas, which was not permitted to intervene.  Because the Florida court actually permitted presentation of evidence on all of the proposed affirmative defenses, and the affirmative defenses were on all fours with the proposed counterclaims, it is obvious that the Defendants would not be permitted to pursue the counterclaims at a later time as they would be barred by the doctrine of *res judicata*.  In the unlikely event that the Florida court expected that the counterclaims would be preserved for later litigation and this was partly the basis for its ruling, that conclusion would have been reversible on appeal and the Defendants should have brought a timely appeal.

presented evidence intended to show that, regardless of fault, they did not owe Mr. Al-Saleh any money. In particular, the Defendants alleged that Mr. Al-Saleh had been paid considerable amounts already, and that certain contracts were actually resulting in losses. *See generally* Pl. Exhs. 8-28 (trial transcript). The jury in the Florida Action was presented with evidence with regard to the ABN debt and the fact that IOTC USA was involved in a Congressional investigation. Pl. Exhs. 17 at 59-64 (trial transcript, pp. 1242-47), 26 at 53-63 (trial transcript, pp. 2717-27). IOTC USA's attorneys further argued to the jury that IOTC USA was incurring heavy losses on some of the Military Contracts because of Mr. Al-Saleh's actions. Pl. Exh. 9 at 98-99 (trial transcript, pp. 297-98).

Following the presentation of evidence, the Defendants moved the Florida court to permit all of the affirmative defenses previously presented in the Motion to Amend, to conform with the evidence presented at trial. Pl. Exh. 26 at 69-70 (trial transcript, p. 2733-34). The Florida court denied the motion, stating that "it would be prejudicial at this point to have these affirmative defenses added separate and apart from whether there is evidence to conform." *Id.* at 75 (trial transcript, p. 2739). While the Florida court cited prejudice as a basis for denial of the Defendant's motion, it also considered, "[b]y using one example," whether the Defendants had presented sufficient evidence to meet their initial burden on the proposed affirmative defenses. *Id.* The Florida court took as its example the Defendants' affirmative defense that an act of state caused them to effectively part ways with Mr. Al-Saleh. The parties had argued that particular affirmative defense at great length and in detail. The Florida court stated that the Defendants had not met their burden and that the entirety of the motion "would be denied regardless of whether there was a finding of prejudice or not." *Id.*

Upon the conclusion of evidentiary presentation and closing argument, the Florida court issued jury instructions in a form approved by Mr. Al Saleh, IOTC USA, Mr. Sargeant, and Mr. Abu-Naba'a.  Among other things, the court instructed the jury that "if you find for Mr. Al-Saleh, you should award Mr. Al-Saleh an amount of money that the greater weight of the evidence shows will . . . fairly and adequately compensate Mr. Al-Saleh for profits owed to him by Defendants." *Id.* at 101-02 (trial transcript, pp. 2765-66). Consistent with this instruction, the jury was permitted to consider in its award all of the testimony relating to what Mr. Al-Saleh had received from the IOTC entities either through salary payments, dividends to owners of IOTC Jordan, or other sources, and also what profit or loss the IOTC entities expected to gain, in total, from the Military Contracts. *See id.*  Counsel for IOTC USA interpreted that jury instruction with appropriate perspective:

> Mr. Al-Saleh, he wants you to award money against my clients, even though they don't have his money; even though the money he wants was paid over to somebody; even though the Defendants lost all the money we talked about . . . even though his own actions caused – cost my clients $5 million in that Supreme Fuels judgment . . .

Pl. Exh. 27 at 77 (trial transcript, p. 2886).

On July 27, 2011, the jury returned a verdict in favor of Mr. Al-Saleh on all counts. Pl. Exh. 28 at 4-6 (trial transcript, pp. 2961-63).  The jury assessed total damages sustained by Mr. Al-Saleh at $28.8 million.  *Id.*  Thereafter, the Florida court issued separate judgments pursuant to the verdict in the amounts of $28.8 million for damages and $85,000 for costs.  Pl. Exhs. 37-38.  In 2013, following appeal regarding pre-judgment interest, the court issued a third judgment in an amount of over $3.5 million.  Pl. Exh. 39.

The three judgments issued pursuant to the jury's verdict and subsequent appeals in the Florida Action (collectively, the "Judgments") are now final and unappealable.  Mr. Al-

Saleh has attempted numerous collection actions against Mr. Sargeant, IOTC USA, and related entities and individuals. *See International Oil Trading Company, LLC's Amended Answer to Involuntary Petition and Motion to Dismiss or Abstain* [ECF No. 90] (the "Motion to Dismiss") at 6-7. By mid-2015, with the addition of post-judgment interest, IOTC USA owed Mr. Al-Saleh some $38 million on the Judgments. *Involuntary Petition* [ECF No. 1] (the "Petition").

### Mr. Al-Saleh's Statements and DLA Litigation

The trial in state court attracted media attention. *See* Def. Exh. 20. IOTC USA alleges that particular comments on the record at trial attracted unfavorable attention to IOTC USA and Mr. Sargeant. On two occasions at least, counsel for Mr. Al-Saleh noted that certain payments to a Jordanian government-owned private entity could be explained only by corruption. Pl. Exh. 27 at 18, 114-15 (trial transcript, pp. 2827, 2923-24).

At some time prior to 2011, Mr. Al-Saleh communicated with at least one member of the press about the allegations. Def. Exh. 20 (news article quoting Mr. Al-Saleh); Pl. Exh. 51 (admission of IOTC USA that alleged statements to the press occurred prior to 2011); Pl. Exh. 52 (IOTC USA interrogatory response affirming that statements at issue emerged in 2008). In an interview with NBC News, Mr. Al-Saleh said that he was personally responsible for the IOTC entities' success with the Military Contracts, because of his role in procuring a letter of authorization from the Jordanian government: "without the letter, you can't bid . . . whoever got the letter got the contract." *Id.* Mr. Al-Saleh also took credit for smoothing the logistics of the operation by ensuring that oil could be offloaded at the port of Aqaba "without interference, bureaucratic or otherwise." *Id.* IOTC USA denied Mr. Al-Saleh's statements to NBC News. *Id.* IOTC USA now alleges that the statements were

11

"false, baseless, malicious and harmful."  Motion to Dismiss at 2.[8]

IOTC USA alleges that as a result of the unwanted scrutiny, IOTC USA and other Sargeant-related entities were not able to obtain further government fuel contracts and thus stopped operating.  *See* Def. Exh. 5 at 8.  A member of the United States Congress initiated an investigation into IOTC USA.  Def. Exh. 21.  In addition, DLA ceased payments to IOTC USA for work already performed, later citing the corruption allegations as a cause.  Def. Exh. 22.

IOTC USA maintains that the DLA breached the Military Contracts without excuse.  For several years, IOTC USA has been litigating its $74 million claim against DLA at the Armed Services Board of Appeals (the "DLA Litigation").  By virtue of its security interest, ABN has a perfected lien on $60 million of the potential recovery in the DLA Litigation.

**Jordanian Tax Liability**

In December 2011, Mr. Al-Saleh met with the Kingdom of Jordan's Ministry of Finance as a representative of IOTC Jordan without authorization to act on behalf of that entity.  Def. Exh. 6.  Due to alleged mis-statements by Mr. Al-Saleh, the Jordanian government assessed IOTC Jordan certain taxes and penalties and required certain disclosures.  *Id.*  It seems that Mr. Al-Saleh did not comply with the government's assessments and requests, did not inform his fellow investors of the problem, and the problem festered until brought to the attention of Mr. Sargeant and Mr. Abu-Naba'a in 2015.  *Id.*

The Jordanian government has not assessed IOTC USA.  Pl. Exh. 55 at 199-200.

---

[8] It is not clear from the Motion to Dismiss which statements of Mr. Al-Saleh were allegedly false, baseless, malicious and harmful.  If Mr. Al-Saleh made statements to the press other than those quoted above, such statements are not in evidence.

IOTC USA has never paid taxes in Jordan.  *Id.*  IOTC USA does not own any property in Jordan that could be seized as a result of the tax assessment against IOTC Jordan.  *Id.*

IOTC USA points to the Service Agreement between IOTC Bahamas and IOTC Jordan as the basis for its argument that IOTC USA may be liable for payment of the tax obligation incurred by IOTC Jordan.  Response at 12.  IOTC USA cites no provision of the Service Agreement to support this position.  Rather, IOTC USA states that "[a]ny of IOTC Jordan's expenses relating to the Military Contracts would be reimbursed by IOTC USA from the proceeds of those contracts."  Def. Exh 5, par. 16.  But IOTC USA is not a party to the Service Agreement.  Def. Exh. 10.  There is nothing before the Court to suggest that IOTC USA may be held liable for the potential tax liability of IOTC Jordan to the Jordanian government.

### Involuntary Petition and Financial Affairs of IOTC USA

On June 26, 2015, Mr. Al-Saleh initiated this proceeding with the filing of the Petition.  By that time, IOTC USA had not actively engaged in business for at least four years.  Litigation against Mr. Al-Saleh and the DLA thus represents the full extent of IOTC USA's ongoing activity.

IOTC USA has few assets.  Its largest asset is its claim against the DLA.  The extensive costs of legal representation in the DLA Litigation are paid on behalf of IOTC USA by other Sargeant-controlled entities that share in the claim against the DLA.

IOTC USA's only other asset is a 50% interest in a company based in the Republic of Cyprus called Solvochem Logistics, Ltd. ("Solvochem").  ECF No. 16.  Solvochem owns a fuel storage facility in Aqaba, Jordan that IOTC USA and IOTC Jordan used during their work on the Military Contracts.  The value of IOTC USA's Solvochem holding is not clear.

IOTC USA has agreed to an injunction against actions that could dissipate the value of Solvochem or its assets.  *Id.*

As of the petition date, IOTC USA had only three creditors, holding sizeable outstanding debts that IOTC USA and its third-party funders were unwilling and/or unable to pay: Mr. Al-Saleh, ABN, and Supreme Fuels.

As previously described, Mr. Al-Saleh holds Judgments against IOTC USA for an aggregate amount exceeding $38 million.  To date Mr. Al-Saleh has successfully collected a mere $31,400 by virtue of a levy and judicial sale of certain personal property of Mr. Sargeant.  ECF No. 7.

IOTC USA owes ABN approximately $60 million for financing provided in connection with the Military Contracts.  ABN's debt is secured by proceeds of those contracts.  Currently, ABN's hope of repayment rests in the successful resolution of the DLA Litigation.  To that end, ABN has signed an agreement with IOTC USA (the "Tolling Agreement") tolling the statute of limitations on its claim.  ABN has not specifically agreed to forbear on collection of its claim.

IOTC USA owes Supreme Fuels some $5 million pursuant to a 2011 judgment. Supreme Fuels is not currently attempting to collect on its judgment, and has not appeared in this case.  IOTC USA has made essentially no payments to Supreme Fuels on its judgment.

**Motion to Dismiss and Recoupment Claims**

A month after Mr. Al-Saleh filed the Petition, IOTC USA filed an answer in the form of the Motion to Dismiss, which it later amended and supplemented as both an answer and a motion.  *See* ECF Nos. 24, 89, 90.  In the Motion to Dismiss, IOTC USA asks the Court to

14

dismiss this proceeding pursuant to § 303 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, and in the alternative requests that the Court abstain from hearing this case pursuant to its authority under § 305.

In the Motion to Dismiss, in relevant part with regard to the present Motion for Summary Judgment,[9] IOTC USA requests that the Court dismiss the Petition on two grounds: first, IOTC USA denies that Mr. Al-Saleh is eligible to file the Petition under § 303(b)(1), which requires that a petitioning creditor be a holder of a claim that is not "subject to bona fide dispute as to liability or amount." Second, IOTC USA argues that § 303(h)(1), which states that the Court shall enter an order for relief only if "the debtor is generally not paying such debtor's debts as such debts become due," precludes entry of an order for relief in this case.

Mr. Al-Saleh filed the Motion for Summary Judgment on September 28, 2015 in response to IOTC USA's allegations under § 303 contained in the Petition. The parties filed the Response and Reply in early December, 2015, and the Court held a hearing on the Motion for Summary Judgment on December 11, 2015.

With regard to § 303(b)(1), IOTC USA argues that Mr. Al-Saleh is ineligible because IOTC USA possesses several claims against Mr. Al-Saleh in the nature of recoupment against Mr. Al-Saleh's claim. IOTC USA argues that such recoupment claims place Mr. Al-

---

[9] The filing of the Motion to Dismiss, which includes both a response to the Petition under § 303 and, in this case, a request to abstain, results in a contested matter. Unlike in traditional two party litigation, where a motion to dismiss most typically challenges the sufficiency of the complaint itself, the response to an involuntary petition is often called a motion to dismiss rather than an answer. That motion places the matter in dispute, often requiring a trial. Absent that response, the Court would enter an order for relief under § 303(h). As is often the case with contested involuntary petitions, there may be factual disputes that would necessitate evidentiary presentation, in addition to disputes with regard to the law. Thus, it is appropriate to entertain summary judgment in the context of a motion to dismiss an involuntary petition.

Saleh's claim in bona fide dispute, rendering him ineligible as a petitioning creditor.

IOTC USA raises six alleged recoupment claims. Three of these claims are the Pre-Judgment Claims, which were contemplated in the Florida Action. IOTC USA argues that these three claims are not barred by *res judicata* because the Florida court explicitly denied the pre-trial motion to amend the counterclaim without prejudice, thus arguably permitting the claims to be presented at a later time. Mr. Al-Saleh argues that the Pre-Judgment Claims are barred by *res judicata* as a result of the court's ruling in the Florida Action.

The other three alleged recoupment claims relate to activities that IOTC USA says occurred following the Florida Action. In spite of the obvious timing concern, IOTC USA alleges that these post-Florida Action claims relate back to the same transaction or occurrence (i.e., the Military Contracts) that was the subject of the Florida Action and so are in the nature of recoupment.

First, IOTC USA alleges that Mr. Al-Saleh is liable to IOTC USA for what it believes is his share of the cost of pursuing the DLA Litigation and his share of the ongoing liability to ABN for financing of performance under the Military Contracts (the "One-Third Claim"). Pointing to the Florida litigation and Judgements, IOTC USA suggests that Mr. Al-Saleh is "an asserted one-third partner in IOTC USA's business." Motion to Dismiss at 2; *compare* Pl. Exh. 53 (IOTC USA response to interrogatory citing Mr. Al-Saleh's deposition), *with* Def. Exh. 11 at 124-130 (cited portion of Mr. Al-Saleh's deposition, in which Mr. Al-Saleh claims partnership in the Military Contracts as opposed to IOTC USA). As a supposed one-third partner, IOTC USA believes Mr. Al-Saleh should bear some of the burden of those liabilities. Mr. Al-Saleh points out that not only has IOTC USA admitted that Mr. Al-Saleh has never been a partner in IOTC USA, but also the One-Third Claim was implicated in the

jury's damages assessment in the Florida Action and *res judicata* now prohibits presentation of that claim.

Second, IOTC USA alleges that Mr. Al-Saleh is liable to IOTC USA for damages caused by "baseless, malicious and harmful statements to the press which resulted in an unfounded Congressional investigation" (the "Defamation Claim").  Motion to Dismiss at 2.  This claim relates to statements made to news media as recounted *supra* and, although not designated as such, appears to be in the nature of defamation.  In the Response, IOTC USA also implies that statements of Mr. Al-Saleh's counsel during the Florida Action support this claim.  *See* Response at 15.  Mr. Al-Saleh argues that the Defamation Claim is a tort claim based upon alleged actions of Mr. Al-Saleh during and after the Florida Action, and thus cannot relate to the "same transaction or occurrence" that was contemplated in the Florida Action.

Third, IOTC USA alleges that Mr. Al-Saleh is liable to IOTC USA for damages arising from communications by Mr. Al-Saleh with Jordanian tax authorities, as recounted *supra* (the "Jordanian Tax Claim").  In response, Mr. Al-Saleh notes that the Jordanian tax liability at issue was incurred by IOTC Jordan, and there is no reason to believe IOTC USA is liable on the claim in any manner.  Also, Mr. Al-Saleh argues that the Jordanian Tax Claim is based on alleged actions of Mr. Al-Saleh from 2011 to 2015 and cannot relate to the "same transaction or occurrence" that was contemplated in the Florida Action.

Mr. Al-Saleh argues, as a general proposition, that there is no such thing as a recoupment claim against a final and non-appealable judgment.

With regard to § 303(h)(1), IOTC USA argues that it is generally paying its debts as they become due because (1) it is paying ongoing expenses for the DLA Litigation, (2) Mr.

Al-Saleh's debt is subject to bona fide dispute, and (3) ABN and Supreme Fuels are not attempting to collect against IOTC USA.  Mr. Al-Saleh disputes that the Judgments are subject to bona fide dispute.  Mr. Al-Saleh also notes that, even ignoring his claim and the payment of litigation expenses, IOTC USA owes some $65 million that has remained unpaid and past-due for several years.


II.    <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56, made applicable to this matter by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is appropriate if the Court determines that the "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant supports its assertion that a fact cannot be disputed by citing to the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the burden of meeting this standard.  *Imaging Bus. Machs., LLC v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  In considering a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in the light most favorable to the non-moving party.  *In re Pony Express Delivery Services, Inc.*, 440 F.3d 1296, 1300 (11th Cir. 2006).

III.    <u>Analysis</u>

**Mr. Al-Saleh Is Eligible to be a Petitioning Creditor**

Section 303(b) requires that a petitioning creditor be "a holder of a claim against [the alleged debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount."

The phrase "bona fide dispute" is not defined in the Bankruptcy Code.  The majority of courts to consider the meaning of "bona fide dispute" apply an objective standard. *In re Huggins*, 380 B.R. 75, 82 & n. 30 (Bankr. M.D. Fla. 2007) (collecting cases).  "Because the standard is an objective one, an alleged debtor's subjective intent or belief is irrelevant, and the mere or conclusory denial of a claim's validity or amount is not sufficient to create a bona fide dispute." *In re Tamarack Resort, LLC*, No. 09-03911-TLM, 2010 WL 1049955, at *2 (Bankr. D. Idaho Mar. 17, 2010).  This standard requires the court to "determine whether there is an objective basis for either a factual or a legal dispute as to the validity of debt." *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987).  "However, 'the statute does not require the court to determine the outcome of any dispute, only its presence or absence. Only a limited analysis of the claims at issue is necessary.'" *Id.* (quotation omitted).

> In applying this standard, the petitioning creditor must establish a prima facie case that no bona fide dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating that a bona fide dispute does exist. Because the standard is objective, neither the debtor's subjective intent nor his subjective belief is sufficient to meet this burden. The court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute. This does not mean that the bankruptcy court is totally prohibited from addressing the legal merits of the alleged dispute; indeed, the bankruptcy court may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists.

19

*In re Rimell*, 946 F.2d 1363, 1365 (8th Cir. 1991) (internal and external citations omitted).

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended § 303 to provide that claims at issue must not be the subject of a bona fide dispute *as to liability or amount*. 11 U.S.C. § 303(b)(1) (emphasis added).  Public Law 109-8, § 1234 (Apr. 20, 2005), 119 Stat. 23, 204.  It is generally accepted that the 2005 amendment to § 303(b)(1) changed the analysis so that a dispute as to any portion of a claim, even if some dollar amount would be left undisputed, means there is a bona fide dispute as to the amount of the claim and such claim cannot be counted to satisfy § 303(b)(1).  *See In re Vicor Techs., Inc.*, 2013 WL 1397460, *4-6 (Bankr. S.D. Fla. 2013) (describing legislative history and subsequent case law); *see also In re Excavation, Etc., LLC,* 09-60953FRA7, 2009 WL 1871682 (Bankr. D. Or. June 24, 2009); *In re Euro-Am. Lodging Corp.*, 357 B.R. 700, 712 n.8 (Bankr. S.D. N.Y. 2007) ("As a result of the amendment, any dispute regarding the amount that arises from the same transaction and is directly related to the underlying claim should render the claim subject to a *bona fide* dispute"); *In re Orlinsky*, 06-15417-BKC-RAM, 2007 WL 1240207 (Bankr. S.D. Fla. Apr. 24, 2007).

As this Court has previously stated, "a defense to a claim in the form of recoupment goes to the heart of the claim and results in a bona fide dispute of the claim.  But a defense to a claim in the form of an independent counterclaim does not in any manner challenge the original claim and so does not place the original claim in bona fide dispute."  *Vicor*, 2013 WL 1397460 at fn. 3 (citing *Collier on Bankruptcy* ¶ 303.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *In re Mylotte, David & Fitzpatrick*, No. 07-11861, 2007 Bankr. LEXIS 2375 (Bankr. E.D. Pa. July 12, 2007)).

As the petitioning creditor, Mr. Al-Saleh carries the initial burden to establish a

*prima facie* case that there is no dispute as to liability or amount.  *Riverview Trenton RR Co. v. DSC, Ltd. (In re DSC, LTD.)*, 486 F.3d 940, 944 (6th Cir. 2007) (burden rests on petitioning creditors to establish they are qualified).  Mr. Al-Saleh met this burden by providing documentation of his claim in connection with the petition in this case.  Mr. Al-Saleh holds un-stayed Judgments, no longer subject to appeal, against the alleged debtor that have been satisfied in small part by collection efforts.

The burden then shifts to IOTC USA to show by a preponderance of the evidence that Mr. Al-Saleh's claim is subject to bona fide dispute.  *In re Bimini Island Air*, 370 B.R. 408 (Bankr. S.D. Fla. 2007).  IOTC USA argues that the Judgments are subject to bona fide dispute as a result of claims held by IOTC USA that are in the nature of recoupment. Motion to Dismiss at 1-3.

Section 303(b)(1) requires that a petitioning creditor hold a "claim" against the debtor.  Under § 101(5)(A), a "claim" is a "right to payment, whether or not such right is reduced to judgment." 11 U.S.C. § 101(5)(A).  A claim need not be reduced to judgment to support an involuntary petition.  But, of course, a judgment is a claim.[10]

**Recoupment Against Final Judgments**

Mr. Al-Saleh argues that the Judgments are his claim rather than the rights to payment he presented at trial.  It is indeed true that many claims are deemed merged into a resulting judgment, so that the claims are no longer independently viable; the judgment

---

[10] There is some dispute as to whether a final judgment may nonetheless be subject to a bona fide dispute on the merits of the underlying claims for purposes of section 303(b)(1) because the judgment remains subject to appeal.  *Compare In re Byrd*, 357 F.3d 433, 436 (4th Cir. 2004) (bankruptcy court may consider whether judgment on appeal is subject to bona fide dispute), *with In re Marciano*, 708 F.3d 1123 (9th Cir. 2013) (judgment cannot be subject to bona fide dispute despite appeal).  Although not dispositive here, because the Judgments are no longer subject to appeal, this Court agrees with the analysis in *Byrd*.

is thereafter the sole basis for collection.  Mr. Al-Saleh argues that, based on the nature of recoupment (analyzed in more detail below), any recoupment claim must arise from the judgment itself, that it is not permissible to base recoupment on the transactions or occurrences that gave rise to the claim that later resulted in the judgment.  In other words, Mr. Al-Saleh argues that for purposes of recoupment analysis the Court may not look behind the Judgments.

IOTC USA argues that recoupment against a judgment is possible because the Court is permitted to analyze whether the proposed recoupment claim arises from the same transaction as the claims that resulted in the judgment.  IOTC USA argues that the Court must look behind the Judgments.

Yet the question presented here is not as simple as whether a judgment replaces the claim that gave rise to it.

A claim of recoupment "is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded."  *Bull v. U.S.*, 295 U.S. 247, 262 (1935).  Recoupment is "a purely defensive matter springing from the same transaction as the plaintiffs' cause of action, which is available only to reduce or satisfy a plaintiffs' claim."  *In re Sundale, Ltd.*, 499 Fed. Appx. 887, 892 (11th Cir. 2012) (per curiam) (quoting *Kellogg v. Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A.*, 807 So.2d 669, 670 n. 2 (Fla. 4th DCA 2001)).

Similarly, under both federal and Florida law, a party is required to present as a so-called compulsory counterclaim any claim that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim.  *See* Fed. R. Civ. P. 13; Fla. R. Civ. P. 1.170(a).  In determining whether a counterclaim is compulsory under Florida law, this

Court employs a four-prong test:

> (1) Are the issues of fact and law raised by the claim and counterclaim largely the same?
>
> (2) Would res judicata bar the subsequent suit on defendant's claim absent the compulsory counterclaim rule?
>
> (3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?
>
> (4) Is there any logical relation between the claim and the counterclaim?

*Montgomery Ward Dev. Corp. v. Juster*, 932 F.2d 1378, 1381 (11th Cir. 1991) (citing *Mascotte v. Florida Municipal Liability Self Insurers Program,* 444 So.2d 965, 966 (Fla. App. 1983); *Yost v. American National Bank,* 570 So.2d 350, 352 (Fla. App. 1990)). An affirmative answer to any of the foregoing questions would mean that the counterclaim is compulsory. *Id.* (citing *Roberts v. National School of Radio and Television Broadcasting,* 374 F. Supp. 1266, 1270 (N.D.Ga.1974)). The Court must accord each prong of the test a "broad, realistic interpretation." *Id.* (citing *Stone v. Pembroke Lakes Trailer Park, Inc.,* 268 So.2d 400, 402 (Fla. App. 1972). In the case of the "logical relation" prong, the Court looks to whether the claims arise from the same "aggregate operative facts." *Id.* (citing *Neil v. South Florida Auto Painters, Inc.,* 397 So.2d 1160 (Fla. App. 1981).

The definition of recoupment appears wholly subsumed by the definition of a compulsory counterclaim. *See Metropolitan Cas. Ins. Co. of N.Y. v. Walker,* 9 So.2d 361, 362 (Fla. 1942) ("the feature distinguishing a compulsory from a permissive counterclaim is the one that also distinguishes a recoupment from a set-off"). Indeed, the Court is hard pressed to think of a recoupment claim that would not also be a compulsory counterclaim. If a counterclaim is a defense to the original claim and springs from the same transaction— if it is in the nature of recoupment—then it must be presented as a compulsory

counterclaim. *See Sundale*, 499 Fed. Appx. at 892 (recoupment is "analogous to a compulsory counterclaim"); cf. *Maynard v. Household Finance Corporation III*, 861 So. 2d 1204, 1207 (Fla. 2d DCA 2003).

The doctrine of *res judicata* bars the filing of all claims that were compulsory counterclaims in prior litigation. *Nationwide-Southeast, Inc. v. American Interstate Ins. Co.*, 270 Fed. Appx. 781, 782 (11th Cir. 2008) (citing *Johnson v. First Carolina Fin. Corp.,* 408 S.E. 2d 151, 153 (Ga. Ct. App. 1991). In general, it does not matter whether the compulsory counterclaim is actually presented in the litigation. Indeed, a compulsory counterclaim is barred in a later action even if the trial court, for reasons procedural or otherwise, forbids the pursuit of the counterclaim. *Nationwide-Southeast*, 270 Fed.Appx. at 782; *Republic Health Corp. v. Lifemark Hosps. of Florida, Inc*., 755 F.2d 1453, 1454-55 (11th Cir. 1985). If the trial court causes undue prejudice to the potential counter-claimant by preventing presentation of the counterclaim, that decision of the trial court may be an appealable error. *See, e.g., Underwriters at Interest on Cover Note JHB92M10582079 v. Nautronix, Ltd.*, 79 F.3d 480, 484-85 (5th Cir. 1996) ("it is an abuse of discretion for a trial court to deny a plaintiff's motion to amend when the denial of that motion could unduly prejudice the plaintiff's action as a result of res judicata implications"). The counter-claimant must timely pursue an appeal or forfeit the counterclaim.[11] One might

---

[11] As discussed below, the claims that form the basis for the Pre-Judgment Claims were actually litigated, and so the Court rules that *res judicata* attached, independent of whether such claims were compulsory counterclaims. Nevertheless, it is obvious that IOTC USA's proposed counterclaims were compulsory and IOTC USA was required to take any and all appropriate action to preserve those claims or lose them for good. IOTC USA argues that the Florida court denied its motion to amend to present the Pre-Judgment Claims as counterclaims "without prejudice", thus preserving those claims for later presentation. The Court rules below that this was not the effect of the Florida court's ruling. If it was, the Court is aware of no law permitting a trial court to preserve a compulsory counterclaim for a future action. Such an action is contrary to the body of law addressing compulsory counterclaims. If IOTC USA believed there was something to preserve, IOTC

argue that if a counter-claimant is prohibited from pursuing a compulsory counterclaim through no fault of its own, such as by fraudulent actions of its opponent, that a claim in recoupment might survive litigation of related claims. Yet presentation of such a claim would require proof of such bad acts, acts that necessarily fall outside the transaction that originally formed the basis for the counterclaim. In other words, the elements of recoupment would no longer be present.

IOTC USA claims to hold recoupment claims arising from the same transactions that were the subject of the Florida Action. Applying simple logic, if all claims alleged as recoupment against a final judgment are compulsory counterclaims, and all compulsory counterclaims are barred by *res judicata*, then all of such recoupment claims are barred by *res judicata*. Because IOTC USA's proposed recoupment claims would be barred by *res judicata*, they cannot form the basis of a bona fide dispute. The claim represented by the Judgments is not subject to bona fide dispute. Mr. Al-Saleh is eligible to be a petitioning creditor under § 303(b)(1).

**Pre-Judgment Claims**

Even if it was possible to have a recoupment claim with regard to a judgment, the Pre-Judgment Claims are not recoupment claims. The Pre-Judgment Claims were actually litigated as affirmative defenses in the Florida Action and are now barred by *res judicata*.

"Under *res judicata*, also known as claim preclusion, a final judgment on the merits bars the parties to a prior action from re-litigating a cause of action that was or could have been raised in that action." *Kaiser Aerospace & Elecs. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp.),* 244 F.3d 1289, 1296 (11th Cir. 2001). This Court applies Florida law in

---

USA should have pursued an appeal to preserve its alleged counterclaims. *See Underwriters*, 79 F.3d at 484-85.

determining whether to invoke the doctrine of *res judicata* with respect to a judgment made by a Florida court. *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1509 (11th Cir. 1985). "The Florida doctrine of *res judicata* bars subsequent litigation where there is (1) identity of the thing sued for, (2) identity of the cause of action, (3) identity of persons and parties to the actions, and (4) identity of the quality or capacity of the person for or against whom the claim is made." *Id.* (citing *Stevens v. Len-Hal Realty, Inc.*, 403 So. 2d 507, 508 (Fla. DCA 1981); *Seaboard Coastline Railroad v. Industrial Contracting Co.*, 260 So. 2d 860 (Fla. DCA 1972)).

The Florida Action and the instant matter present identical claims for damages. *See id.* (citing *Valdes v. Ruiz,* 354 So. 2d 1269 (Fla. DCA 1978)) (*res judicata* applies to damages claims). The parties are the same.

When analyzing the identity of the causes of action, Florida courts consider the "similarity of the facts essential to the maintenance of both actions." *See id.* at 1510 (citing *Gordon v. Gordon,* 59 So. 2d 40 (Fla. 1952); *Smith v. Florida East Coast Railway Co.,* 151 So.2d 70 (Fla. 3d DCA 1963)). The Court looks to "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1239 n. 8 (11th Cir. 1999) (quoting Restatement (Second) of Judgments § 24(2) (1980)).

IOTC USA argues, in essence, that the facts essential to the maintenance of the Florida Action and the alleged recoupment claims presented here cannot be similar because some of its claims were affirmative defenses and others were proposed counterclaims, and the Florida court differentiated the claims as such. IOTC USA argues that the

26

counterclaims were preserved and are not barred by *res judicata*. Yet, for purposes of the Court's analysis here, there is no difference between the affirmative defenses actually litigated by IOTC USA and the proposed counterclaims. The affirmative defenses and the counterclaims are the same in terms of origin, motivation, timing, facts, and law. In both, IOTC USA argued that Mr. Al-Saleh unlawfully retained $3 million he was supposed to deliver to NRDC. In both, IOTC USA argued that Mr. Al-Saleh unlawfully received a secret commission or kickback from Supertrucker. In both, IOTC USA argued that Mr. Al-Saleh colluded with Supreme Fuels and Al-Jasem in direct competition with entities to which he owed fiduciary duties. When the Florida court denied IOTC USA's motion to add those claims as affirmative defenses at trial, it permanently foreclosed the possibility of IOTC USA bringing those same claims again as counterclaims, recoupment claims, or any other type of claims against Mr. Al-Saleh.

What, then, did the Florida court mean when it denied "without prejudice" the pre-trial motion of IOTC USA and IOTC Bahamas, to add counterclaims and an independent claim by IOTC Bahamas? Given the fact that the Florida court specifically permitted IOTC USA's claims to be presented as defenses at trial, and the parties themselves agreed that this would be the case, the only logical interpretation of the Florida court's denial "without prejudice" was that the court was preserving the claim of IOTC Bahamas, which was not a party to the action. Whatever claim IOTC Bahamas may have against Mr. Al-Saleh, that claim might still be pursued.[12]   But the Florida court and the parties themselves assumed

---

[12] It is possible that the claim of IOTC Bahamas is also barred as a result of issue preclusion, as it is arguable that IOTC Bahamas was substantially aligned with IOTC USA in a manner that could make the Judgments binding on IOTC Bahamas. The outcome of this question is not relevant to the present ruling. Even if IOTC Bahamas retained a claim against Mr. Al-Saleh after trial in the Florida Action, that claim would not cause Mr. Al-Saleh's claim to be subject to bona fide dispute here. IOTC USA and IOTC Bahamas are separate entities. Even so, it appears likely that any claim

that IOTC USA's affirmative defenses, the bases for which are identical to its proposed counterclaims, would be presented at trial, they were presented, and the Florida court ruled on such claims on the merits. *Res judicata* attached, and IOTC USA retains no claims against Mr. Al-Saleh that share a nexus with the affirmative defenses it actually presented. If IOTC USA was unsure as to the effect of the Florida court's denial of its pre-trial motion "without prejudice," IOTC USA should have timely appealed that ruling. It did not.

The Pre-Judgment Claims are barred by *res judicata*. IOTC USA may not bring them as recoupment claims or otherwise against Mr. Al-Saleh. Thus, even if it is possible to have a recoupment claim with regard to a judgment, the Judgments are not in bona fide dispute as to the Pre-Judgment Claims.

**One-Third Claim**

Even if it was possible to have a recoupment claim with regard to a judgment, the One-Third Claim does not place the Judgments in bona fide dispute because it was a necessary component of the Florida Action and is thus barred by *res judicata*.

In the Motion to Dismiss, IOTC USA articulates the One-Third Claim in this way:

> Mr. Al-Saleh, as an asserted one-third partner in IOTC USA's business, must bear his one-third share of the liabilities of IOTC USA and has not done so. Those liabilities include, but are not limited to, Mr. Al-Saleh's one-third share of (1) liability of approximately $60 million to [ABN] under a credit facility that IOTC USA arranged to finance the operational expenses associated with the contracts with [the DLA] . . . and (2) legal fees incurred in connection with an action brought by IOTC USA against DLA to recover payments owed by DLA to IOTA USA [sic].

Motion to Dismiss at 2. In the Response, IOTC USA addresses the One-Third Claim along with the Defamation Claim, arguing in essence that Mr. Al-Saleh is to blame for IOTC USA's collection difficulties and thus should share collection costs.

---

held by IOTC Bahamas is now time barred under Florida law.

The facts alleged by IOTC USA in the Motion to Dismiss are insufficient to support any claim against Mr. Al-Saleh for one-third of IOTC USA's debts to ABN or IOTC USA's litigation expenses.  Mr. Al-Saleh won a judgment against IOTC USA by proving several tort claims.  IOTC USA admits that at no time did Mr. Al-Saleh formally become a one-third partner in IOTC USA.  IOTC USA also admits that Mr. Al-Saleh is not a signatory on the ABN loan.

It is true that, in a general sense, Mr. Al-Saleh believed himself a one-third partner in the enterprise of procuring and performing under contracts to transport fuel across Jordan and into Iraq for the United States government.  He sued IOTC USA based on that theory and was successful in the Florida Action.  Yet Mr. Al-Saleh's Judgments do not depend on a finding that he was ever a true partner in IOTC USA, because he was not.  Mr. Al-Saleh reasonably believed that his efforts in the fuel supply enterprise would be rewarded in a particular manner.  The Florida court and jury agreed.  But that ruling does not make Mr. Al-Saleh a formal partner of IOTC USA, thereby potentially personally liable for its obligations.  There is nothing in the record in the Florida Action to support that conclusion.  Perhaps more importantly, IOTC USA cites no law that would permit this Court to make such a leap.  There is simply no legal basis for such a position.

Even if there was a viable legal theory that Mr. Al-Saleh should be liable for any obligations of IOTC USA as a "partner," any such claim was in fact litigated in the Florida Action.  The jury in the Florida Action was presented with evidence with regard to the ABN debt.  IOTC USA's own attorneys argued before the jury that IOTC USA was losing money on the Military Contracts due to Mr. Al-Saleh's actions.  The Florida court instructed the jury to include in its consideration of damages the entirety of the profit the Defendants,

including IOTC USA, expected to realize from the Military Contracts. The jury received evidence concerning those expected profits. In closing statements counsel for the Defendants argued strenuously that there were no profits withheld from Mr. Al-Saleh because there were no profits in existence due to collection difficulties and other expenses. Counsel noted that, at the time of trial, IOTC USA had yet to collect on several of the Military Contracts, and that for this and other reasons IOTC USA was incurring losses and suffering increased liabilities in connection with those contracts. IOTC USA's ongoing losses and increasing liabilities were actually presented at trial in the Florida Action and were pointed to by counsel for the Defendants in an effort to offset Mr. Al-Saleh's claims. In deliberating to judgment, the jury was specifically instructed to consider not the gross revenue the Defendants were to receive under the Military Contracts, but the profit to be received, which necessarily included consideration of expenses in obtaining that revenue. The One-Third Claim is entirely subsumed in that analysis. In other words, the One-Third Claim was actually litigated before the Florida court. The One-Third Claim is now barred by *res judicata*.[13]

### Defamation Claim

Even if it was possible to have a recoupment claim with regard to a judgment, the Defamation Claim is not in the nature of recoupment and so does not place the Judgments in bona fide dispute. A recoupment claim must arise from the same transaction and be directly related to the underlying claim. The Defamation Claim is an allegation of tortious

---

[13] In the Response, IOTC USA suggests that the Court should consider the One-Third Claim as a separate tort, nevertheless in the nature of recoupment, because tortious actions of Mr. Al-Saleh increased IOTC USA's collection difficulties in a manner that was not foreseeable during the Florida Action and yet relates back to the Military Contracts. This argument is essentially identical to arguments presented regarding the Defamation Claim, addressed in greater detail below, and is rejected for the same reasons.

conduct wholly separate from the actions that formed the basis of the Judgments.

The Judgments resulted from claims of fraud and other tortious conduct by IOTC USA against Mr. Al-Saleh, between 2005 and 2008, that deprived Mr. Al-Saleh of his share of profits relating to the Military Contracts.  In contrast, the Defamation Claim arises from allegedly tortious statements made by Mr. Al-Saleh to the media prior to the conclusion of the Florida Action.[14]  IOTC USA argues that the Defamation Claim relates back to the Military Contracts because the alleged tortious conduct made it hard for IOTC to collect on existing contracts.  To prove the Defamation Claim under any applicable theory IOTC USA would need to show, at a minimum, that Mr. Al-Saleh made certain statements and that the statements were false.  Neither of these factual issues were implicated in any way in the claims presented in the Florida Action.  Even it exists, the Defamation Claim is at most in the nature of setoff, and thus does not result in a bona fide dispute of the claim represented by the Judgments.[15]

### Jordanian Tax Claim

Even if it was possible to have a recoupment claim with regard to a judgment, IOTC USA does not have standing to present the Jordanian Tax Claim and so that claim cannot place the Judgments in bona fide dispute.

---

[14] IOTC USA suggests that Mr. Al-Saleh would be liable for statements of his counsel during the Florida Action.  A defamation-like claim may not be based on statements made during trial.  *See, e.g., In re Fundamental Long Term Care, Inc.*, 512 B.R. 690, 702 (Bankr. M.D. Fla. 2014) (citing *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole,* 950 So.2d 380, 380–81 (Fla.2007); *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.,* 639 So.2d 606, 608 (Fla.1994); and other cases) (In Florida, "absolute immunity shall be afforded to any act occurring during the course of a legal proceeding so long as it has some relation to the legal proceeding").

[15]  In any case, IOTC USA admits that any alleged statements that support the Defamation Claim were made prior to 2011.  Indeed, there is no evidence presented here that Mr. Al-Saleh made any such statements later than 2008.  It appears that the Defamation Claim likely is time-barred.  *See* Fla. Stat. § 95.11.

IOTC USA has no direct liability for payment of taxes to Jordan. Such taxes are an obligation of IOTC Jordan. It does not matter that IOTC USA is likely to provide funds to IOTC Jordan to pay the taxes if this is required. And it does not matter that such funds likely would come from proceeds under the Military Contracts.

In any case, the Jordanian Tax Claim is not in the nature of recoupment. On its face, the Jordanian Tax Claim concerns actions of Mr. Al-Saleh that allegedly occurred beginning in 2011. Such facts are necessarily wholly distinct from those presented in the Florida Action, which began in 2008.

### IOTC USA Is Not Generally Paying its Debts as They Become Due

Section 303(h) provides, in relevant part:

(h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount.

"The courts apply a flexible totality of the circumstances test in determining whether a debtor is 'generally not paying' his debts, which focuses on the number of unpaid claims, the amount of the claims, the materiality of nonpayment and the overall conduct of the debtor's financial affairs." *In re Huggins*, 380 B.R. 75, 83 (Bankr. M.D. Fla. 2007); *cf. In re Vicor Techs., Inc.*, 2013 WL 1397460, *2 (Bankr. S.D. Fla. 2013). This flexible approach permits the courts to address the extremes that are sometimes presented by involuntary petitions.

On one end of the spectrum we find an operating debtor entity, fully capable of self-

sustenance as a going concern but for one creditor or creditor faction using an involuntary petition for their individual advantage to the detriment of the entity and its creditor body as a whole.  In such cases, the Court's analysis of whether or not the alleged debtor is generally paying its debts often invokes bankruptcy policy to deter creditors from "using involuntary petitions as a club to coerce the debtor to satisfy judgments when substantial questions may remain concerning the debtor's liability."  *See In re Tikijian,* 76 B.R. 304, 313–14 (Bankr. S.D. N.Y. 1987) (citing S. 7618, 98th Cong. 2d Sess., June 19, 1984).  For instance, in *In re St. Marie Development Corp. of Montana, Inc.*, the alleged debtor's former management left the company "in total disarray financially."  334 B.R. 663, 671 (Bankr. D. Mont. 2005).  After new management resumed operations and began resolving issues with creditors, the ex-insiders filed an involuntary proceeding.  *Id.*  The court noted that while some debts remained unpaid in whole or part, "the majority of debts . . . clearly are those held by former insiders of [alleged debtor] SMDC, and are extraordinary in nature."  *Id.*  The court declined to enter an order for relief.  *Id.* at 671-74 (also finding the petition filed in bad faith).

On the other end of the spectrum we find a non-operating entity "near and perhaps beyond its last gasp." *Vicor*, 2013 WL 1397460 at 2.  For such an entity, an involuntary bankruptcy petition represents recognition of the inevitable.  For instance, in *Vicor*, many of the alleged debtor's obligations "remained unpaid for an extended period of time."  *Id.*  As a result of arrears on the debts, the alleged debtor's former management had admitted during their tenure that the company was unable to conduct its business activities:

> . . . lack of working capital has severely restricted the Company's ability to implement its sales strategies. The Company needs to continue to incur expenditures to further the commercial development of its products. These matters raise substantial doubt about the Company's ability to continue as a

going concern.

*Id.* at 3.  As in *St. Marie Development Corp.*, the former management of the company departed and filed an involuntary petition.  *See id.*  However, unlike that case, the new management of *Vicor* failed to resume business operations, obtain new financing, or pay any debts.  *Id.* This Court noted that even if the petitioning creditor, ex-insiders' claims were found to be subject to bona fide dispute, the alleged debtor could "not even suggest that the bulk of its accounts payable are so disputed."  *Id.* at 2.

IOTC USA presents no material argument or evidence to negate Mr. Al-Saleh's allegation that IOTC USA is generally not paying its debts as such debts become due. Instead, IOTC USA attempts to portray itself as a *St. Marie Development Corp.* case, in which disgruntled ex-insiders filed an improper petition in order to destroy an otherwise viable company.  But in this case, as in *Vicor*, the disgruntled former associate is correct: IOTC USA's current management concedes that it owes its creditors over $100 million, and that such debts have remained unpaid for an extended period of time.  IOTC USA's current management concedes that it has not operated in over four years and has no plans to do so ever again.  Even if IOTC USA succeeds in the DLA Litigation and recovers in full, IOTC USA will still owe its creditors in excess of $20 million.  Even if Mr. Al-Saleh's claim was subject to bona fide dispute, and it clearly is not, IOTC USA does not even suggest that the bulk of its debts are disputed.

IOTC USA's argument with regard to the ABN and Supreme Fuels debts rests on the fact that neither creditor is actively attempting collection.  But non-collection is irrelevant to the question of whether the debts are due.  *In re West Side Community Hosp., Inc.*, 112 B.R. 243, 256 (Bankr. N.D. Ill. 1990) ("[m]ere failure of a creditor to demand

payment of a debt does not excuse failure to pay it") (citing *In re All Media Properties, Inc.* 5 B.R. 126, 145 (Bankr. S.D. Tex. 1980)).  Nor does the Tolling Agreement excuse IOTC USA's non-payment of the $60 million due to ABN: tolling the statute of limitations on collection of a debt does not alter the due date of the debt.[16]  IOTC USA cannot in good faith dispute that it owes $65 million to two creditors and is paying neither.

IOTC USA argues that its payment of ongoing expenses in the form of litigation expenses should alter the Court's § 303(h) analysis.  The litigation expenses, however, are not significant in comparison to the undisputed ABN and Supreme Fuels debts.  In fact, at least one court encountering nearly identical facts has ruled that regular payment of minor operational debts is not evidence that the alleged debtor is "generally" paying debts as they become due:

> In the present case, all but three of [the debtors'] debts are being paid. Nothing in the present record, however, indicates such are other than small monthly consumer amounts as in [*Denham v. Shellman Grain Elevator, Inc.*, 444 F.2d 1376 (5th Cir. 1971)]. The three unpaid are obviously large and of such consequence as not to be overlooked. Nor are those to the banks disputed. That to Cargill may be disputed but it constitutes such an overwhelming portion of the total that the failure to pay that alone as well constitutes "generally not paying".

*Matter of Hill*, 5 B.R. 79, 83 (Bankr. D. Minn. 1980); *cf. In re Garland Coal & Mining Co.*, 67 B.R. 514, 522 (Bankr. W.D. Ark. 1986) (debtor generally not paying its debts as they became due where, although the debtor was paying most of its creditors in number, the

---

[16] There is some dispute as to whether a forbearance agreement alters the due date of a debt for purposes of § 303(h) analysis.  *Compare In re Smith*, 243 B.R. 169, 192 (Bankr. N.D. Ga. 1998) ("making arrangements to extend payment is evidence of failure to pay debts as they become due") (citing *All Media Properties*, 5 B.R. at 45), *with In re Spivey*, 2010 WL 5476754, *2 (Bankr. S.D. Ga. 2010) (finding that debtor's use of forbearance agreement kept some debts current).  The parties have not submitted the Tolling Agreement to the Court for review.  However, at the December 11, 2015 hearing on the Motion for Summary Judgment, IOTC USA conceded that its agreement with ABN merely tolls the statute of limitations and is not in the nature of forbearance.

total debt which it was not paying exceeded 50% of its outstanding liabilities); *In re Kreidler Import Corp.*, 4 B.R. 256 (Bankr. D. Md. 1980) (order for relief entered where single large debt constituted over 97% of the total obligations).

As in *Hill*, IOTC USA is able—via gifts from a third-party, but able nonetheless—to pay small, regular amounts to fund its continuing existence.  Yet the more than $100 million in obligations that are otherwise outstanding is an "overwhelming portion" such that failure to pay those debts means that IOTC USA is generally not paying its debts as they come due.

There is no material dispute that at the time of the filing of the Petition in this case IOTC USA was not paying its debts as they became due. The requirements of § 303(h)(1) are satisfied.


IV.    <u>Conclusion</u>

For the foregoing reasons, it is ORDERED and ADJUDGED that:

1.    The Motion for Summary Judgment [ECF No. 54] is GRANTED.

2.    The Motion to Dismiss [ECF No. 90] is DENIED IN PART.  The alleged debtor's motion to dismiss this proceeding pursuant to 11 U.S.C. § 303 is denied with prejudice.

3.    The Court will conduct trial in this matter solely on the issue of whether the Court should abstain from exercising jurisdiction over this involuntary bankruptcy proceeding pursuant to 11 U.S.C. § 305.

4.    The Court will not enter an order for relief in this case unless and until the remainder of the Motion to Dismiss is denied.

5.    The Court has already noticed a status conference on the Motion to Dismiss for February 11, 2016 at 10:30 a.m. at the United States Bankruptcy Court, The Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, Courtroom B, West Palm Beach, Florida 33401 [ECF No. 120].  At that status conference the Court will set this matter for trial.

###

Copies Furnished To:

Gregory S. Grossman, Esq.

Gregory S. Grossman, Esq. is directed to serve a conformed copy of this Order on all appropriate parties and file a certificate of service with the Court.