

**ORDERED in the Southern District of Florida on April 28, 2016.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | **CASE NO.: 15-21596-EPK** |
| **INTERNATIONAL OIL**<br>**TRADING COMPANY, LLC,** | **CHAPTER 7** |
|     **Alleged Debtor.** | |
| _____/ | |

### ORDER GRANTING IN PART AND DENYING IN PART
### THIRD MOTION TO COMPEL PRODUCTION
### <u>OF DOCUMENTS FROM MOHAMMAD AL-SALEH</u>

**THIS MATTER** came before the Court for hearing on March 18, 2016 and April 14,

2016 upon *International Oil Trading Company, LLC's Third Motion to Compel Production*

*of Documents from Mohammad Al-Saleh* [ECF No. 140] (the "Third Motion to Compel")

filed by the alleged debtor International Oil Trading Company, LLC ("IOTC USA").  In the

Third Motion to Compel, IOTC USA requests that the Court compel Mohammad Al-Saleh to

respond to various discovery requests.  As provided in more detail below, the Court grants

in part the Third Motion to Compel, requiring Mr. Al-Saleh to provide to IOTC USA,

through counsel, a copy of his composite funding agreement with Burford Capital, LLC,

from which Mr. Al-Saleh may redact all terms of payment and all terms reflecting attorney

mental impressions and opinions concerning Mr. Al-Saleh's litigation against IOTC USA,

subject to further objection and possible review of the same by the Court *in camera*.  All

other relief requested in the Third Motion to Compel will be denied.

**BACKGROUND**

Mr. Al-Saleh is a citizen of the Hashemite Kingdom of Jordan.  IOTC USA is a

Florida limited liability company.  In the mid-2000s, Mr. Al-Saleh and IOTC USA

collaborated in procuring and executing contracts to transport fuel across Jordanian

territory to Iraq on behalf of the United States military.  The parties' relationship soured,

and Mr. Al-Saleh sued IOTC USA and other parties in Florida in 2008.  Thereafter, Mr. Al-

Saleh entered into a contractual relationship with Burford Capital, LLC ("Burford") to fund

his litigation against IOTC USA.  Burford has played a near-daily role in Mr. Al-Saleh's

litigation efforts, providing funding and assisting with legal and strategic decisions.

Mr. Al-Saleh won a judgment against IOTC USA and the other defendants in the

Florida litigation in 2011, and the judgment was upheld on appeal.  He has been largely

unable to collect, despite numerous collection attempts in various courts.  As a result, on

June 26, 2015, Mr. Al-Saleh filed the involuntary bankruptcy petition that commenced this

case.

IOTC USA responded to the petition with what is now *International Oil Trading*

*Company, LLC's Amended Answer to Involuntary Petition and Motion to Dismiss or Abstain*

[ECF No. 90] (the "Motion to Abstain").  The Motion to Abstain contains an answer to the

allegations in the involuntary petition, a motion to dismiss under § 303 of the Bankruptcy

Code,[1] and a motion to abstain under § 305 of the Bankruptcy Code.  *See* ECF Nos. 89, 90 (docketing amended response separately as answer and motions).

In its Order Granting Motion for Summary Judgment, entered on February 8, 2016 [ECF No. 132], the Court denied IOTC USA's motion to dismiss this involuntary proceeding under § 303.  The only issue remaining for trial is whether the Court should abstain from exercising jurisdiction over this involuntary bankruptcy proceeding under § 305.

In its Motion to Abstain, among other things, IOTC USA argues that this bankruptcy is essentially a continuation of its two-party dispute with Mr. Al-Saleh and that this bankruptcy case is harmful to IOTC USA and its other creditors.  IOTC USA argues that Mr. Al-Saleh has more proper venues for his collection efforts, and that this bankruptcy jeopardizes IOTC USA's efforts in certain valuable litigation and thus IOTC USA's debt to another funder in connection with that litigation.  In essence, IOTC USA argues that Mr. Al-Saleh's motivation to file this bankruptcy is improper.

IOTC USA also argues that the Court should abstain because Mr. Al-Saleh is not the "real-party-in-interest" in this case.  To that effect, IOTC USA argues that through or along with his funding arrangement with Burford, Mr. Al-Saleh transferred some interest in the judgment debt owed by IOTC USA.  If so, IOTC USA argues that Mr. Al-Saleh is not "in the driver's seat" and thus his role as petitioning creditor is not appropriate.

On July 30, 2015, IOTC USA served Mr. Al-Saleh with its First Request for Production of Documents (the "Request," attached as Exh. A to the Third Motion to Compel).  In sub-parts 13-15 of the Request, IOTC USA requests that Mr. Al-Saleh produce documents evidencing any sort of transfer of Mr. Al-Saleh's judgment against IOTC USA or

---

[1] 11 U.S.C. §§ 101 *et seq.*

the debt represented thereby.  In sub-part 16 of the Request, IOTC USA requests that Mr. Al-Saleh produce all documents relating to transfers of funds from Burford to Mr. Al-Saleh. In sub-parts 17-18 of the Request, IOTC USA requests that Mr. Al-Saleh produce all written communications between Mr. Al-Saleh and Burford from January 1, 2011 to the present, as well as all documents relating to such communications (collectively, the "Burford Communications").

On August 17, 2015, Mr. Al-Saleh responded to the Request with a number of general and specific objections to sub-parts 13-18.  Most notably, Mr. Al-Saleh objected that all of the responsive documents are subject to attorney-client privilege, common interest/joint defense privilege, and work product protection.[2]  Mr. Al-Saleh provided a partial privilege log claiming such protections for all documents responsive to sup-parts 13-16 of the Request, which collectively make up the funding agreement between Mr. Al-Saleh and Burford (the "Funding Agreement").  Mr. Al-Saleh requested additional time to prepare, and guidance from the Court in connection with, a privilege log regarding the Burford Communications, noting that the responsive documents totaled many thousands of pages.

Over the next six months, the Court entertained a number of motions by which IOTC USA sought to compel production of either the Burford Communications or a privilege log describing the documents subject to privilege.  Ultimately, on February 19,

---

[2] Mr. Al-Saleh's privilege logs also contain claims of "confidentiality" protection.  Mr. Al-Saleh later clarified that he merely wished to indicate to the Court, as a component of his attorney-client privilege and work product protection claims, that he and Burford had memorialized their intention to maintain confidentiality in their communications.  In this Order, the Court will not consider contractual confidentiality provisions as an independent basis for protection against discovery.  The Court notes, however, that the existence of a confidentiality agreement typically does not, alone, protect information from discovery.

4

2016, IOTC USA filed the Third Motion to Compel, in which it argued that Mr. Al-Saleh had violated this Court's prior orders by failing to tender a privilege log consistent with the Court's direction.  IOTC USA requested that the Court compel Mr. Al-Saleh to produce all documents responsive to sub-parts 13-18 of the Request.  IOTC USA also objected that, to the extent Mr. Al-Saleh had provided a compliant privilege log, his claims of attorney-client privilege and work product protection were not appropriate to the documents at issue. IOTC USA asked the Court to award sanctions against Mr. Al-Saleh representing IOTC USA's fees and costs in connection with its various efforts to compel production.

On March 29, 2016, the Court issued its *Order Denying in Part and Setting Further Hearing On International Oil Trading Company, LLC's Third Motion to Compel Production of Documents from Mohammad Al-Saleh* [ECF No. 151] (the "Privilege Log Order").  In the Privilege Log Order, the Court ruled that Mr. Al-Saleh had produced a privilege log that complied with the Court's prior orders.  The Court denied the Third Motion to Compel except as to IOTC USA's objection to Mr. Al-Saleh's claims of privilege and work product protection.

In the Privilege Log Order, the Court noted that "there remains an outstanding and novel question of law as to whether, under the circumstances of this case, a party's litigation funding agreement and communications with a litigation funder are subject to attorney-client privilege, the work product doctrine, or another type of protection from discovery."  The Court observed that, in previous briefs and in oral argument, the parties had focused their attention on the issue of whether Mr. Al-Saleh had furnished a sufficient privilege log.  The parties had not, however, addressed in detail the questions of privilege and work product protection.  The Court determined to provide the parties with an

opportunity for further briefing and oral argument.  On April 14, 2016, the Court held a non-evidentiary hearing on the remaining requested relief.   The Court now grants in part and denies in part the Third Motion to Compel, for the reasons stated below.

## ANALYSIS

### Choice of Law

The parties cite primarily federal case law presenting federal common law on the issues of attorney-client privilege and the work product doctrine.  Although the determination of the remaining issues for trial in this Court presents only matters of federal statutory and case law, communications made in the context of prior litigation in Florida state courts and elsewhere may be relevant to the Court's decision here.  There is some concern that such communications may have been made under the appropriate assumption that they were protected from discovery consistent with the law applicable in that prior litigation, but that they might be subject to a different analysis here in the context of this involuntary bankruptcy proceeding, as it is governed solely by federal law.  In the present circumstances, such concern is unfounded.  In light of the fact that Mr. Al-Saleh's initial claim against IOTC USA was brought largely as a fraud claim under Florida law and judgment was entered in a Florida state court, it appears the state with the most significant relationship to the claims and the parties, as a whole, is Florida.  *See Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999 (Fla. 1980) (adopting "significant relationship test" for choice of law questions arising in tort).  Yet the applicable Florida law on the issues of attorney-client privilege and the work product doctrine is so parallel to the applicable federal common law that it would lead the Court to the same conclusions.  For this reason, in addition to reliance on appropriate federal precedent, the Court cites below

the similar analyses presented in Florida statutory and case law, which only bolster the Court's ruling here.

### Attorney-Client Privilege and Waiver

Mr. Al-Saleh argues that both the Funding Agreement and the Burford Communications are protected from discovery as a result of application of the attorney-client privilege. As a threshold matter, the Funding Agreement is primarily a contract, not a communication. Under both federal and Florida law, attorney-client privilege applies only to communications, not to contracts. The Court thus focuses its privilege analysis on the Burford Communications.

The attorney-client privilege protects confidential disclosures by a client to an attorney made in order to obtain legal assistance. Federal common law presents both a general rule regarding waiver of attorney-client privilege and several exceptions to that rule. Under the general rule, a client's disclosure of privileged information to non-attorneys constitutes waiver of the privilege. But the general rule does not govern where, for instance, the third party possesses a "common interest" with the client, or the third party is an "agent" of the client.

The federal common law "exceptions to waiver" or "rules of non-waiver" are substantially similar to the exceptions explicitly provided in Fla. Stat. § 90.502, which states, in relevant part:

> (c) A communication between lawyer and client is "confidential" if it is not intended to be disclosed to third persons other than:
>
> 1. Those to whom disclosure is in furtherance of the rendition of legal services to the client.
>
> 2. Those reasonably necessary for the transmission of the communication.

7

Burford is not Mr. Al-Saleh's attorney.  Under the most simple application of the general rule of waiver, Mr. Al-Saleh waived his attorney-client privilege by communicating otherwise privileged matters with Burford.  The question, then, is whether any existing exception to waiver nevertheless protects the Burford Communications from discovery.  In this Court's view, the Burford Communications are protected by both the common interest exception and the agency exception.  These conclusions are supported by the better reasoned federal case law, and also by existing law in the State of Florida.

**The Common Interest Exception**

The common interest exception to waiver is a common law doctrine by which Courts uphold attorney-client privilege, in spite of the disclosure of attorney-client communications to a third party, because that third party shares a "common interest" with the client.

An essential element of the exception is that the parties must maintain a reasonable expectation of confidentiality in their communications.  Similarly, Fla. Stat. § 90.502(c) requires that the communications be "not intended to be disclosed."  The subjective element of intent is satisfied in this case by the uncontested assertion that the Funding Agreement between Mr. Al-Saleh and Burford contains a confidentiality provision.

Broadly speaking, under federal law there are two approaches to the "common interest" exception.  The first is to require that the client and third party have a legal interest in common, as opposed to a merely commercial interest.  For instance, in *Leader Technologies, Inc. v. Facebook*, cited by both parties, a federal district court in Delaware denied a claim of attorney-client privilege because the common interest between the claimant and its litigation funder was commercial in nature rather than legal.  719 F. Supp. 2d 373 (D. Del. 2010).  It is worth noting, however, that the *Leader Technologies* decision

8

was issued on appeal from an oral ruling of a bankruptcy court which ruling is now sealed. On appeal, the district court opined only that the bankruptcy court's ruling was not "clearly erroneous," and noted that applicable case law did not consistently support the bankruptcy court's decision. *Id.* at 376-77. Likewise, in *Miller UK Ltd. v. Caterpillar,* a district court in Illinois held that a client's relationship to a litigation funder was merely "a shared rooting interest in the 'successful outcome of a case'" and thus "not a common legal interest." 17 F. Supp. 3d 711, 732 (N.D. Ill. 2014).

The second approach to "common interest" requires only that the "third party and the privilege holder are engaged in some type of common enterprise and that the legal advice relates to the goal of that enterprise." *Rembrandt Techs., LP v. Harris Corp*, 2009 WL 402332 (Del. Super. Ct. 2009). In *Rembrandt*, issued by a Delaware state court roughly contemporaneously with *Leader Technologies*, the court found that attorney-client privilege protected communications among a patent holder, his attorney, and a patent enforcement consultant. The parties intended to enforce the patent through litigation, and fully intended their communications to remain confidential and subject to privilege. Several courts have followed similar logic in upholding the attorney-client privilege with regard to litigation funders, citing a "shared common interest in litigation strategy" and "actual cooperation toward a common legal goal" as the bases for the common interest. *See, e.g.*, *Devon IT, Inc. v. IBM Corp.*, 2012 WL 4748160 (E.D. Pa. 2012) (requiring disclosure of communications between client and Burford "would intrude upon attorney-client privilege under the 'common-interest' doctrine"); *Walker Digital, LLC v. Google Inc.*, 2013 WL 9600775 (D. Del. 2013) (finding "common legal interest" between client and patent monetization consultant).

Florida courts, and federal courts applying Florida law, lean toward the more

9

expansive "common enterprise" approach to the "common interest" exception.  In fact, the official comment following Fla. Stat. § 90.502 states that "practicality requires that some disclosure outside the immediate lawyer-client circle be allowed without impairing confidentiality."  The comment provides specific examples of parties to whom disclosure may be allowed including, without limitation, "business associates."  As stated by one federal court applying Florida law, there are three threshold questions to determine whether the attorney-client and joint-defense privilege, also known as the common interest privilege, should apply: (1) whether the original disclosures were necessary to obtain informed legal advice and might not have been made absent the attorney-client privilege; (2) whether the communication was such that disclosure to third parties was not intended; and (3) whether the information was exchanged between the parties for the limited purpose of assisting in their common cause.  *Developers Surety & Indemnity Co. v. Harding Village, Ltd.*, 2007 WL 2021939 (S.D. Fla. 2007).  That cause need not be an identical legal cause, but rather a "common, litigation-related cause." *Infinite Energy, Inc. v. Econnergy Energy Co.*, 2008 WL 2856719 (N.D. Fla. 2008).

The Court finds compelling the more expansive "common enterprise" approach to the "common interest" exception presented in *Developers Surety*, and adopts that standard. This approach corresponds to the position articulated by Mr. Al-Saleh.

Mr. Al-Saleh's disclosures to Burford were necessary to obtain informed legal advice, specifically advice as to how to prosecute a collection action against IOTC USA and how to fund that action.  Mr. Al-Saleh, his counsel, and Burford did not intend to disclose their communications to third parties.  The information exchanged between the parties was for the limited purpose of assisting in their common cause, which was to propound litigation to

collect on a claim against IOTC USA.

The Court rules that all communications among Burford, Mr. Al-Saleh, and his counsel are protected from discovery as they are subject to the attorney-client privilege as a result of application of the common interest exception. The Third Motion to Compel is thus subject to denial to the extent it seeks an order directing the delivery of such documents. This basis, alone, is sufficient for such relief.

**The Agency Exception**

Clients may engage the services of non-attorney professionals in furtherance of their litigation aims. The so-called "agency exception" to waiver of the attorney-client privilege protects from discovery the necessary communications with such parties. Although neither of the parties addressed this issue, it is a legal issue squarely before the Court as a result of Mr. Al-Saleh's blanket claim of attorney-client privilege and IOTC USA's general argument of waiver.

The agency exception to waiver of the attorney-client privilege was first articulated by the Second Circuit in *U.S. v. Kovel*. 296 F.2d 918 (2nd Cir. 1961). The Fifth Circuit cited *Kovel* affirmatively in a ruling that remains binding on this Court. In that case, *U.S. v. Pipkin*, the court stated that "[i]n appropriate circumstances the privilege may bar disclosures made by a client to non-lawyers who . . . [have] been employed as agents of an attorney." 528 F.2d 559, 562 (5th Cir. 1976). Courts have variously applied the agency exception to non-attorney professionals such as accountants, non-testifying experts and consultants, and patent agents. *See* Michele DeStefano, *Claim Funders and Commercial Claim Holders: A Common Interest or a Problem?*, 63 DePaul L. Rev. 305, 331-41 (2014).

As with the common interest exception, there are two approaches to the agency

11

exception.  The narrow approach applies the exception only to persons identified as "translators," meaning those who interpret information the client and attorney already possess.  *See id.*  In this category fall paralegals, law clerks, secretaries, and language translators, in addition to some non-attorney professionals such as accountants, depending on the tasks performed.  *See, e.g.*, *Young v. Taylor*, 466 F.2d 1329, 1332 (10th Cir. 1972) (applying exception to secretaries and law clerks); *In re G-I Holdings Inc.*, 218 F.R.D. 428, 434 (D. N.J. 2003) (limiting exception to certain tasks performed by accountants).

The second approach to the agency exception is to extend the waiver to a broader array of professionals with whom communication may be necessary for the provision of legal advice.  For example, the Southern District of New York applied the agency exception to communications with a public relations firm in *In re Grand Jury Subpoenas Dated March 24, 2003.*  265 F. Supp. 2d 321, 326 (S.D.N.Y. 2003).  In that case, the court noted that the firm provided much-needed "outside help" to assist the attorney, and that the firm's assistance "ha[d] a close nexus to the attorney's role in advocating the client's cause before a court or other decision-making body."  *Id.*  Similarly, the Third Circuit in *U.S. v. Alvarez* protected a client's communications with a psychiatrist because "the effective assistance of counsel with respect to the preparation of an insanity defense demands recognition that a defendant be as free to communicate with a psychiatric expert as with the attorney [the expert] is assisting." 519 F.2d 1036, 1046 (3rd Cir. 1975).

The broader approach to the agency exception also appears to apply under Florida law.  For example, in *Royal Bahaman Ass'n, Inc v. QBE Ins. Corp*, 2010 WL 3637958 (S.D. Fla 2010), a federal district court applied Florida law in ruling that communications at issue "relate[d] to the legal services being rendered" for reasons similar to those cited in *In*

12

*re Grand Jury Subpoenas* and *U.S. v. Alvarez.  Royal Bahaman*, 2010 WL 3637958 at *4. The court noted that the respondent to a discovery motion, an insurer, "would be handcuffed in its ability to evaluate the claim if its field adjuster could not communicate with QBE's outside counsel without waiving the attorney-client privilege." *Id.*

        The Court believes the case law applying the broader approach to the "agency exception" is more consistent with the purpose for the exception and thus better reasoned. The broader approach to the "agency exception" is also in agreement with Florida law. Florida Statutes § 90.502(c)(2) protects communications with those "to whom disclosure is in furtherance of the rendition of legal services to the client."  This protection is in addition to protection of communications with those "reasonably necessary for the transmission of the communication," a provisions that protects communications shared with secretarial staff and other intermediaries.  Read together, it appears these provisions are intended to protect communications with any party who assists the client in obtaining legal services. Litigation funders fall in this category.  One would need to assign a hackneyed construction to the statute to reach another conclusion.

        In this case, Mr. Al-Saleh possesses a judgment against IOTC USA and is attempting to collect on that judgment.  IOTC USA is an entity that has demonstrated an ability and willingness to resist Mr. Al-Saleh's collection efforts.  In order to obtain counsel and collect the money he is owed, Mr. Al-Saleh secured outside funding from a lender.  In order to determine whether to lend money to Mr. Al-Saleh, the litigation funder must assess the potential litigation, both at the outset and on an ongoing basis, using information provided by Mr. Al-Saleh and his counsel.  With that information, the funder may advise Mr. Al-Saleh as to the cost of pursuing collection, the risks involved, and the

best strategies to pursue in litigation.  The thousands of pages of communications at issue in the Third Motion to Compel imply that the funder's involvement has significant value to Mr. Al-Saleh and is integral to his pursuit of legal advice.

Communications with a litigation funder fall within the agency exception for the very reason that litigation funders exist -- because without litigation funders, parties owed money, or otherwise stymied by deep-pocketed judgment debtors, might have reduced or no ability to pursue their claims.  Litigation funders may be essential to the provision of legal advice in such cases.  Absent the ability to communicate with funders without waiving privilege, potential plaintiffs such as Mr. Al-Saleh might be "handcuffed," as in *Royal Bahamian Association*.  *See* 2010 WL 3637958 at *4; *see also In re Cnty. of Erie*, 473 F.3d 413, 420 (2nd Cir. 2007) (legal advice includes considerations of "expense, politics, insurance, commerce, morals, and appearances," and careful lawyering entails "follow-through by facilitation").  Mr. Al-Saleh has engaged Burford "in furtherance of the rendition of legal services," and the communication of otherwise privileged information to Burford did not result in waiver of the attorney-client privilege.

The Court finds that all communications among Burford, Mr. Al-Saleh and his counsel are protected from discovery as they are subject to the attorney-client privilege as a result of the agency exception.  The Third Motion to Compel is thus subject to denial to the extent it seeks an order directing the delivery of such documents.  This basis, alone, is sufficient for such relief.

### Work Product Protection – The Burford Communications

The work product of attorneys, consultants, and other professionals and agents of a party is protected from discovery under most circumstances.  Fed. R. Civ. P. 26(b)(3)

14

provides that documents prepared in anticipation of litigation are not subject to discovery, unless there is a substantial need shown and the party seeking to discover the information cannot acquire it elsewhere without undue hardship.  The rule further provides that if the court orders discovery, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  Fla. R. Civ. P. 1.280(b)(4) provides similar protections.  Consistent with these rules, both the Eleventh Circuit and the Florida Supreme Court have confirmed a distinction between work product that consists purely of facts and work product that concerns the "mental impressions, conclusions, opinions, or legal theories" of an attorney.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994) (citing *In re Murphy*, 560 F.2d 326, 336 (8th Cir. 1977)) (stating that opinion work product "enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances"); *Southern Bell Tel. & Tel. Co. v. Deason*, 632 So.2d 1377, 1384 (Fla. 1994) (citing *State v. Rabin*, 495 So.2d 257, 262 (3rd DCA 1986) ("opinion work product is absolutely, or nearly absolutely, privileged")); *see also State v. Mark Marks, P.A.*, 654 So.2d 1184, 1187 (Fla. 4th DCA 1995) ("opinions of a non-witness work product expert are not discoverable absent a showing of exceptional circumstances").

There is little doubt that the communications sought by IOTC USA -- the very communications IOTC USA says it is looking for to support one theory under its Motion to Abstain -- concern "mental impressions, conclusions, opinions or legal theories".  These are communications between a client, the client's attorney, and a litigation funder whose participation depends on assessments of the merits of litigation.  If they are work product at all, they are opinion work product.

15

IOTC USA argues that the Burford Communications are not work product or are not protected for two reasons: first, because the work product doctrine does not apply to communications with litigation funders and, second, because even if the work product doctrine applies IOTC USA has a substantial need for the Burford Communications and would be unable to obtain the same information elsewhere.

IOTC USA argues that work product protection does not apply to the Burford Communications under the so-called "primary purpose" rule. IOTC USA argues that work product protection "extends only to work product made for the purpose of facilitating the rendition of legal services to the client." IOTC USA argues that communications with Burford fail the "primary purpose" test because Mr. Al-Saleh's relationships with Burford "were not for the primary purpose of litigation, but were instead to permit [Mr.] Al-Saleh to borrow money and Burford to monitor the collateral for its loan receivable."

Even if the "primary purpose" test exists in the manner presented by IOTC USA, it is satisfied by the Burford Communications. The question is not the purpose of Burford's involvement in communications with Mr. Al-Saleh and his counsel. It does not matter that Burford's obvious purpose is to obtain a return on its investment, just as it does not matter that counsel's purpose typically is to earn a fee. Only Mr. Al-Saleh's purpose in communicating with Burford matters here. Mr. Al-Saleh is attempting to collect a debt owed by IOTC USA. To do so, Mr. Al-Saleh must continue to litigate with IOTC USA. This requires him to retain counsel and to pay that counsel. Mr. Al-Saleh determined that it was necessary or advantageous for him to seek assistance of Burford to enable him to fund his litigation efforts, meaning to pay his lawyers and other professionals. Each of these actions is a link in the same chain, leading to collection of the debt owed by IOTC USA.

16

Each link in that chain is "in furtherance of rendition of legal services" and so has a "primary purpose" of facilitating rendition of legal services.

In any case, as far as this Court can tell the "primary purpose" test in the form described by IOTC USA has never been adopted by the Eleventh Circuit. The Fifth Circuit espoused a "primary motivating purpose" test in its opinion in *U.S. v. Davis*, 636 F.2d 1028 (5th Cir. 1981). Although decisions of the Fifth Circuit from that year typically remain binding in the Eleventh Circuit, it is unclear whether Davis might be controlling law due to contradictory case law in the Fifth and Eleventh Circuits. *See United States v. Adlman*, 134 F.3d 1194, 1198 (2nd Cir. 1998) (describing test articulated in *Davis* as "dictum, or in any event a statement going far beyond the issues raised in the case"); *U.S. v. Gericare Med. Supply Co.*, 2000 WL 33156442, *2-3 (S.D. Ala. 2000) (describing case law). The test stated in *Davis* is actually much more forgiving than IOTC USA would lead this Court to believe. The Court in *Davis* held that a communication may be protected by the work product doctrine even where no litigation is pending "as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *U.S. v. Davis*, 636 F.2d at 1040. In the present case, litigation was ongoing at all relevant times and, absent such litigation, there would have been no motivation at all for Mr. Al-Saleh and his counsel to communicate with Burford.

The facts of Eleventh Circuit decisions where work product protection was denied bear no resemblance to the facts here. For instance, in *In re Grand Jury Investigation (Harvey)*, also cited by IOTC USA in favor of the "primary purpose" test, the Eleventh Circuit confronted an attorney who had acted as a banker for and business advisor to a party who, five years later, was charged with a crime. 769 F.2d 1485 (11th Cir. 1985). At

17

the time of the party's communication with the attorney, which was later the subject of discovery requests, neither the party nor the attorney contemplated litigation.  The facts before the Court today could hardly be more different.  But for the necessity of suing IOTC USA for the money he is owed, Mr. Al-Saleh would not be communicating with his counsel in this case, much less non-attorney professionals such as Burford.

It may be true that some portion of the communications among Mr. Al-Saleh, his counsel, and Burford address mundane transactional matters.  Importantly, in this case, any communication that does not at all concern ongoing litigation, prospective litigation, or the like, would not support IOTC USA's theory that Mr. Al-Saleh is an inappropriately active participant in these bankruptcy proceedings.  The Court will not force Mr. Al-Saleh to sort through four years of correspondence, including tens of thousands of e-mails and their attachments, in order to provide IOTC USA with non-relevant information.

**Substantial Need and Undue Hardship**

The next question is whether the Burford Communications are nevertheless discoverable in light of IOTC USA's "substantial need" and the "undue hardship" that it may suffer if required to obtain the information in another manner.  They are not.

There is little doubt that the communications at issue -- the very communications IOTC USA says it is looking for to support one theory in its Motion to Abstain -- concern "mental impressions, conclusions, opinions or legal theories."  They are opinion work product, under both federal and Florida law.  Opinion work product is rarely discoverable.

IOTC USA argues that a so-called "pivotal issue doctrine" permits the Court to override the general rule in this circuit, and elsewhere, that opinion work product is almost never discoverable.  IOTC USA argues that where the mental impressions of counsel are

18

pivotal or central to the litigation before the court, those mental impressions may not be protected from discovery.  To be clear, the Eleventh Circuit has never ruled either way as to whether work product protection should apply when the mental impressions of counsel are the pivotal or central issue in litigation.  Decisions from trial courts in this circuit, and from other circuit courts of appeal, are not consistent.  For instance, in *Doe v. U.S.*, the district court for the Southern District of Florida compelled discovery under the pivotal issue exception, citing Ninth Circuit precedent.  2015 WL 4077440 (S.D. Fla. 2015) (citing *Holmgren v. State Farm Mut. Auto Ins. Co.,* 976 F.2d 573 (9th Cir. 1992).  But an earlier Southern District of Florida opinion denied application of the pivotal issue exception, citing a Fourth Circuit opinion.  *Bd. of Trustees of Leland Stanford Jr. Univ. v. Coulter Corp.*, 118 F.R.D. 532 (S.D. Fla. 1987) (citing *Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 509 F.2d 730 (4th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438 (1975)).

Federal court decisions denying work product protection based on the "pivotal issue" doctrine largely concern factual circumstances that indicate bad faith.  *See, e.g.*, *Holmgren*, 976 F.2d 573; *see also Allstate Indem. Co. v. Ruiz*, 899 So.2d 1121 (permitting discovery of insurance company opinion work product in first-person bad faith claims under Florida law).  Indeed, the bulk of the case law permitting discovery comes from bad faith settlement claims against insurers. Those cases, as in *Holmgren*, typically involve an insurance company that repeatedly attempts to settle with a claimant for an amount that is obviously well below the amount warranted.  In those rare circumstances, the claimant requires access to the mental impressions of the insurer's agents and counsel, despite the availability of circumstantial evidence of the insurer's culpability.  A component of the courts' reasoning is often the fact that the insurer's opinion work product was paid for by

19

and ostensibly developed on behalf of the party now propounding discovery.

It is not necessary for this Court to rule whether the "pivotal issue doctrine" applies here because, even if it does, the facts of this case do not warrant its application. This is not a "rare and extraordinary circumstance," as required by the Eleventh Circuit to override the application of Rule 26(b)(3)(B). *See Cox*, 17 F.3d at 1422. Nor is it an "exceptional circumstance" as required by Florida law to override non-witness opinion work product protection. *See Mark Marks*, 654 So.2d at 1187.

The discovery at issue here is in support of IOTC USA's request for this Court to abstain from its involuntary bankruptcy case. IOTC USA argues that Mr. Al-Saleh filed the involuntary petition with an improper motivation and that his communications with Burford may illuminate this improper motive. The involvement of a litigation funder is not, in and of itself, indicative of an improper motivation. The Court is not aware of any law prohibiting Burford from funding Mr. Al-Saleh's litigation effort. Nor is the fact that Mr. Al-Saleh has been litigating with IOTC USA since 2008, and now files an involuntary bankruptcy petition, on its own indicative of bad faith. Mr. Al-Saleh has been owed a substantial sum for over eight years and, as his other attempts to collect on his debt have failed, he determined to use the present bankruptcy proceedings as a tool for collection. That is not a rare and extraordinary circumstance. Considering just this Court's docket, it is not even unusual. The facts surrounding Mr. Al-Saleh's engagement of and communication with a litigation funder are not in any way indicative of improper activity by those parties. IOTC USA has not met its burden to show "exceptional" or "rare and extraordinary circumstances" such that the Court might allow discovery of opinion work product. So, even if the "pivotal issue doctrine" applies here, which the Court does not

determine, the requested discovery will not be permitted.

**Work Product Protection – The Funding Agreement**

IOTC USA argues that a key fact at issue here is whether Mr. Al-Saleh has transferred some or all of his claim to Burford in exchange for litigation financing.  IOTC USA believes that the Funding Agreement may address this question.  The Funding Agreement itself is work product as it was entered into with the intent to facilitate litigation.  The relevant information that IOTC USA seeks within the Funding Agreement is fact work product not subject to the extraordinary protection discussed above with regard to opinion work product.  Accordingly, the Court must determine whether IOTC USA has demonstrated a substantial need for the Funding Agreement, and whether IOTC USA will suffer an undue burden if it is not able to procure it.

IOTC USA has demonstrated a substantial need for the Funding Agreement because the agreement is central to one theory presented in its Motion to Abstain.  Given the apparent complexity of the agreement and the admitted depth of Burford's involvement in the multi-faceted litigation against IOTC USA, no other document production, depositions, or other discovery methods will adequately substitute for the original document.  Without access to key portions of the Funding Agreement, IOTC USA cannot hope to support a central component of the Motion to Abstain.

Courts have recently noted, however, that some terms of a litigation funding agreement represent an assessment of risk based on discussions of core opinion work product of the case.  *See Carlyle Invmt. Management v. Moonmouth Co.*, 2015 WL 778846, *8-9 (Del Ch. 2015); *Charge Injection Techs., Inc. v. E.I. DuPont De Nemours & Co.*, 2015 WL 1540520, *4 (Del. Super. Ct. 2015).  Revealing certain terms of the agreement might

21

disclose attorney mental impressions and opinion about the case. Thus, while the Court will require Mr. Al-Saleh to produce the Funding Agreement to IOTC USA, Mr. Al-Saleh may redact the terms of payment and any terms he reasonably believes may disclose mental impressions and opinion in relation to Mr. Al-Saleh's litigation with IOTC USA.

**CONCLUSION**

For the reasons stated above, the Court ORDERS AND ADJUDGES that:

1.      The Third Motion to Compel [ECF No. 140] is GRANTED IN PART to the extent provided herein.

2.      No later than April 28, 2016, Mr. Al-Saleh shall provide to IOTC, through counsel, a complete copy of the Funding Agreement. Mr. Al-Saleh may redact from the Funding Agreement all terms of payment and all terms Mr. Al-Saleh reasonably believes may reflect attorney mental impressions and opinions concerning his litigation against IOTC USA.[3]

3.      No later than May 5, 2016, IOTC USA may object to Mr. Al-Saleh's redactions and/or request review of the un-redacted Funding Agreement by this Court *in camera*.

4.      All remaining relief requested in the Third Motion to Compel is DENIED.

### 

Copies Furnished To:

Charles W. Throckmorton, Esq.

Charles W. Throckmorton, Esq. is directed to serve a conformed copy of this Order on all appropriate parties and file a certificate of service with the Court.

---

[3] Although this Order may be entered after the deadlines provided in paragraphs 2 and 3, the Court's ruling was announced on the record at a hearing held on April 26, 2016 and the parties agreed to be bound by such deadlines.

22